# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# EASTERN DIVISION

|  |  |  |
|---|---|---|
| DEANNA WARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. 1:05-1190-T |
| | ) | |
| JO ANNE BARNHART, the | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER REVERSING THE COMMISSIONER'S FINAL DECISION AND DIRECTING THE COMMISSIONER TO AWARD BENEFITS

Plaintiff, Deanna Ward, seeks judicial review[1] of the Commissioner of Social Security's final decision to deny Plaintiff's applications for disability insurance benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401, *et. seq.*, and supplemental security income under Title XVI of the Act, 42 U.S.C. § 1381, *et. seq.* Plaintiff contends, *inter alia*, that she met her burden at step three of the Commissioner's five-part analytical framework for processing disability claims. The court agrees with Plaintiff that she was entitled to benefits pursuant to Listing 12.05(C) of 20 C.F.R. Part 404, Subpart P, Appendix 1. Therefore, the Commissioner's decision is REVERSED and she is directed to award benefits.

I.

---

[1] 42 U.S.C. § 405(g) authorizes such review.

Plaintiff alleged that she became unable to engage in substantial gainful activity because of anxiety, social phobia, bipolar disorder, depression, memory loss, "special education," bladder incontinence, and foot pain. (R. at 35). The agency denied Plaintiff's initial application and her request for reconsideration. (R. at 35, 42). On November 4, 2004, an Administrative Law Judge ("ALJ") presided over a hearing at which Plaintiff, her mother, her brother, and a vocational expert testified. (R. at 439–473). On January 26, 2005, the ALJ issued a written decision finding that Plaintiff was not under a disability as defined in the Act at any time through the date of the ALJ's decision. (R. at 15–23). On May 17, 2005, the ALJ's decision became the final decision of the Commissioner when the Social Security Appeals Council denied Plaintiff's request for further review. (R. at 6). On July 6, 2005, Plaintiff timely commenced this civil action pursuant to 42 U.S.C. § 405(g), seeking to obtain judicial review of the Commissioner's final decision.

The court reviews that decision under the deferential substantial evidence standard. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."). The court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Its role is confined instead to determining whether substantial evidence supports the Commissioner's factual findings and whether the Commissioner applied the proper legal standards. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (citations omitted). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol.*

2

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citations omitted). Evidence may be "adequate to support [the ALJ's] conclusion" even if the court disagrees with that conclusion and even if the same facts would have supported a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

The Act defines disability as the inability to engage in substantial gainful activity due to a "physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Pursuant to its statutory rule-making power, §§ 405(a), 1383(d)(1), the agency has promulgated a five-part sequential evaluation process to govern claims for disability insurance benefits and supplemental security income:

1. An individual who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
2. An individual who does not have a severe impairment will not be found to be disabled.
3. A finding of disability will be made without consideration of vocational factors if an individual is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment found in 20 C.F.R. Part 404, Subpart. P, Appendix 1.
4. An individual who can perform work that he has done in the past will not be found to be disabled.
5. If an individual cannot perform his past relevant work, other factors including age, education, past work experience, and residual functional capacity will be considered to determine if other work can be performed.[2]

With the exception of step five, the burden at each step in this evaluation is on the social security claimant. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)

---

[2]20 C.F.R. §§ 404.1520, 416.920; *see also Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

3

(citations omitted).  If a finding of non-disability can be made at any step, benefits will be denied without considering the next step.  *Hogg v. Sullivan*, 987 F.2d 328, 331 (6th Cir. 1989).

In this case, the ALJ determined that Plaintiff met her burden with respect to steps one and two.  He found that she had not engaged in substantial activity since April of 2000 and that she suffered from a bipolar disorder, generalized anxiety disorder, and "borderline intellectual functioning."[3]  (R. at 22).  At step three, however, the ALJ determined that not one of these severe impairments alone, nor all of them combined, met or equaled one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4.  (*Id.*).  A finding in favor of Plaintiff at step three would have entitled her to benefits irrespective of her past relevant work, or her age, education, work experience, and residual functional capacity.  20 C.F.R. §§ 404.1520(d), 416.920(d); *see Johnson v. Sec'y of Health & Hum. Servs.*, 794 F.2d 1106, 1113–1114 (6th Cir. 1986).

At step four, and based on his determination of Plaintiff's mental and physical residual functional capacities, the ALJ found that Plaintiff failed to prove that she could not perform her past relevant work as a stocker.  (R. at 22).  Although he could have ended his discussion, the ALJ alternatively considered Plaintiff's mental and physical residual functional capacities together with her age, education, and work experience.  (R. at 23).  In light of those vocational factors, the ALJ found that there was a significant number of jobs in the national

---

[3]Much of the Commissioner's brief is devoted to distinguishing "mild mental retardation" from "borderline intellectual functioning."  *See* Comm'r Br. at 7–8 (citing *Elam ex. rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 126 (6th Cir. 2003) and Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition ("DSM-IV") 317.00).

4

economy that Plaintiff could perform.  (*Id.*).[4]  For all of these reasons, the ALJ concluded that Plaintiff was not disabled.

## II.

"The Listing of Impairments describes . . . impairments which are considered severe enough to prevent a person from doing any substantial gainful activity."  20 C.F.R. § 404.1525(a).  The agency's adoption of this list of presumptively disabling impairments "demonstrate[s] the [Commissioner's] decision to sacrifice some flexibility for [the] legitimate administrative goals" of simplification and uniformity of decision.  *Johnson*, 794 F.2d at 1114 (citing *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 530 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983)).[5]  Accordingly, where a social security claimant's impairments meet or equal the Commissioner's definition of a listed impairment, the Commissioner is bound by her own rules to award benefits irrespective of the claimant's residual functional capacity, age, education, or work experience.  *Id.*; *see also Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (noting that, under the agency's five-step evaluation, a claimant who meets step three is "conclusively presumed to be disabled"); 20 C.F.R. §§ 404.1520(d), 416.920(d).

Plaintiff asserts that the ALJ should have found that she was "conclusively presumed

---

[4]The ALJ found that Plaintiff could perform these jobs that existed in significant numbers in the national economy: hand packager, material handler, assembler, parts inspector, parts bagger, folder, final assembler, and touch up inspector.  (R. at 21–22).

[5]The "grids" at 20 C.F.R. Part 404, Subpart P, Appendix 2, which allow the Commissioner to take "administrative notice" of certain facts, reflect a similar decision.  *See generally Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990).

to be disabled" at step three.  In support of this assertion, Plaintiff relies on Listing 12.05—the listing for mental retardation.  To satisfy Listing 12.05, Plaintiff was required to show:

> . . . [S]ignificantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05.  As relevant to this case, Plaintiff also bore the burden of establishing:

> A valid verbal, performance, **or** full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation of function[.]

*Id.* §12.05(C) (emphasis added).  During the hearing, the ALJ essentially conceded that Plaintiff satisfied all of these requirements except for the requirement of a *valid* IQ score between 60 and 70.  (R. at 470–472).

Plaintiff submitted two sets of IQ scores in connection with her social security claim. The first set was were the result of a Wechsler Intelligence Scale for Children ("WISC") test that had been administered by the Memphis City Schools Mental Health Center in 1985, when Plaintiff was nine years old.  (R. at 20, 141, 143).[6]  The results of that test reflected a verbal IQ of 81 and a performance IQ of 61.  (R. at 20, 470).[7]  The ALJ emphasized the

---

[6]Page 142 of the administrative record was missing from the certified copy of the transcript that was filed with the Commissioner's answer to Ward's complaint.  Also missing from the certified copy are the actual results of the 1985 IQ test.  Those results presumably appear on page 142—the missing page.

The test results and the contemporaneous interpretation of those results, though, are referenced several times throughout the record.  The parties do not seem to disagree about either the results or about how they were contemporaneously understood.

[7]The record apparently does not reflect Plaintiff's full-scale IQ in 1985.

higher verbal score because, at the time it was obtained, it "was considered the best estimate of intellectual functioning." (R. at 20). The second set of scores was the result of a 2002 Wechsler Adult Intelligence Scale-3rd Edition (WAIS-III) test, which was administered and interpreted at the state's request by Dan Emerson, M.S., in the context of Plaintiff's claim for benefits. (R. at 187). On that test, Plaintiff scored 83 on the verbal section and 64 on the performance section. (*Id.*).[8] Again, the ALJ disregarded the lower performance IQ and focused on the higher verbal IQ. (R. at 20). He did so because: (1) Emerson had asserted that Plaintiff's scores suggested borderline intellectual functioning, and (2) Plaintiff's reading and spelling performance on the Wide Range Achievement Test-Revision 3 ("WRAT-III") test had been relatively higher than expected.

In the usual case, the Commissioner's regulations require her to credit the *lowest* among a claimant's verbal, performance, and full-scale IQ scores. Section 12.00D.6c. of the listings specifically provides that, "[i]n cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full-scale IQ's are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00 D.6c.; *see also Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 270 (6th Cir. 1991). The ALJ may, however, disregard IQ scores that are invalid. *McDonald v. Sec'y of Health & Hum. Servs.*, No. 85-3322, 1986 U.S. App. LEXIS 22988, at *14–15 (6th Cir. Feb. 25, 1986) (per curiam) (unpublished opinion). An IQ

---

[8]Plaintiff's full-scale IQ in 2002 was 72.

score may be considered invalid if, for instance, it is obtained by an unacceptable source, *see*

*Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 126 (6th Cir. 2003) (upholding an ALJ's rejection

of IQ scores because they were obtained by a person who was not an acceptable source of

medical evidence), or if it is demonstrably inconsistent with the claimant's "academic

success, occupational success, independent living, and ability to care for []self[,]" *see*

*McDonald*, 1986 U.S. App. LEXIS 22988, at *14–15.[9]  The ALJ's conclusion of invalidity

always must be supported by substantial evidence in the administrative record as a whole.

*See Brown*, 948 F.2d at 269–270.

Here, the ALJ explained his conclusion in relevant part as follows:

> The evidence is not convincing that the claimant is mentally retarded. Mental retardation is described . . . as . . . . In 1985, the verbal IQ score of 81 was considered the best estimate of intellectual functioning.  IQ scores in November 2002 suggested the likelihood of intellectual functioning within the borderline range.  Although there was a deficit in arithmetic skills, reading and spelling abilities were at the high school level.

(R. at 20).  The ALJ then continued:

> . . . Even if an individual were considered to be mildly mentally retarded, which the claimant is not, the Diagnostic and Statistical Manual of Mental Disorders at Paragraph 317.00 describes an individual with mild mental retardation as having minimal impairment in sensorimotor areas; can acquire academic skills up to approximately sixth-grade level; and usually achieve social and vocational skills adequate for minimum self-support but may need guidance and assistance when under unusual social or economic stress. . . . [V]irtually all people with mild mental retardation can live successfully in the community, independently, or in supervised apartments or group homes.

(R. at 21).  As these excerpts verify, the only record reasons allegedly supporting the ALJ's

---

[9]Of course, this is not an exhaustive list of the reasons why an IQ score may be considered invalid.  *See, e.g., Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) (rejecting low scores where claimant had not eaten for two days prior to test and had been drinking alcohol until 2:00 a.m. on the day of the test).

rejection of the lowest of Plaintiff's IQ scores were: the 1985 statement that Plaintiff's verbal score was the "best estimate" of intellectual functioning, the 2002 suggestion by Emerson that Plaintiff's scores suggested borderline intellectual functioning, the Plaintiff's ability to read and spell at the "high school level," and the ALJ's casual discussion of "mild mental retardation." (*Id.*).[10]  The Commissioner also points out that Plaintiff had not been diagnosed with mental retardation and had performed substantial gainful activity in the past.  Comm'r Br. at 8.

Neither the ALJ's stated reasons nor the Commissioner's additional rationales, in the court's view, constitute substantial evidence supporting the ALJ's decision to reject Plaintiff's low performance IQ in order to find that Plaintiff failed to satisfy the plain language of Listing 12.05(C).

First, the ALJ should not have attached much significance to the statement that Plaintiff's verbal IQ of 81 was the "best estimate" of her intellectual functioning as of the second grade.  Plaintiff was enrolled in special education from the second grade until she dropped out of school three months into the ninth grade.  (R. at 134–135).  She failed both the fifth and the sixth grades.  (R. at 134).  Although Plaintiff passed both the seventh and

---

[10]It is unclear what the ALJ meant by his discussion of "mild mental retardation."  Although he qualifies that discussion by opining that, "the claimant is not [mildly mentally retarded]," he continues by suggesting that Plaintiff would not have been entitled to a step three decision even if the ALJ had believed Plaintiff *was* mildly mentally retarded.  (R. at 21–22) ("[Most] people with mild mental retardation can live successfully in the community[.]") (citation omitted).  If that is what the ALJ meant to suggest, he was wrong. *See Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 270 (6th Cir. 1991).  A person with mild mental retardation satisfies the listing even though they may be capable of "living successfully in the community." *Id.* ("The Secretary, in promulgating Listing 12.05C, expressly singled out [such] individuals . . . for special treatment in determining entitlements to disability benefits.").

the eighth grades, Plaintiff's mother believes that both of these "[s]ocial [p]romotions" were mistakes.  (*Id.*).  In the seventh grade, for example, Plaintiff was absent thirty-six of one-hundred and eighty school days.  (R. at 129).  She made a grade of "B" in "P.E.," and she made grades of "C" in "Health" and "Music."  (*Id.*).  She made an "F" in "Social Studies," and she made grades of "D" in "English," "Arithmetic," "Life Science," and "Art."  (*Id.*).  In the eighth grade, Plaintiff also was absent a significant number of days—thirty-three.  She made an "F" in "Science," "D's" in "Arithmetic" and "American History," and "C's" in "English" and "Art."  (*Id.*).

There is no basis in the record for concluding that this documentation of childhood academic performance either confirms or refutes the special weight that had been attributed to Plaintiff's higher verbal IQ in 1985.  More important, there is not a scintilla of evidence demonstrating how that documentation somehow *invalidates* the lower performance IQ.  Under those equivocal circumstances, the ALJ should have adhered to the agency's policy of using the lowest of the three "valid" IQ's.[11]

The 2002 opinions Dan Emerson, M.S., also do not undermine the validity of Plaintiff's contemporaneous performance IQ of 64.  As previously stated, Plaintiff's 2002 IQ scores were: full-scale 72, verbal 83, and performance 64, respectively.  (R. at 187).  Emerson noted that the difference between Plaintiff's verbal and performance IQ's was "statistically significant."  (*Id.*).  On that basis, he then concluded that there was a "likelihood

---

[11]In fact, it is not clear if the ALJ should have used *any* of the 1985 scores for the purpose of determining if Plaintiff satisfied Listing 12.05(C).  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00D.10 (suggesting that the 1985 scores were no longer "sufficiently current" after the passing of two years).

10

of intellectual functioning within the borderline range." (*Id.*). He continued by stating that, "[s]ignificantly higher Verbal I.Q. scores suggest the possibility of relatively good academic achievement or possibly over achievement." Not once, however, did Emerson explain the significance of Plaintiff's lower performance IQ or attempt to illustrate its invalidity. Neither did he attempt to test, by reference to examples of Plaintiff's functioning outside of the testing room, the accuracy of his theory that Plaintiff's IQ scores gave rise to a "likelihood" of borderline intelligence or to a "possibility of relatively good academic achievement."

The ALJ and the Commissioner fail to fill in the gaps left by Emerson's test. The ALJ simply points out that Plaintiff's test results suggested that she had the ability to read and spell at the high school level. (R. at 20). True, but it is equally the case that Plaintiff could not complete the third month of her ninth grade year notwithstanding those "relatively good" reading and spelling skills—a fact that quite possibly correlates with, and that hardly invalidates, her low performance IQ. As for the Commissioner, she adds that Plaintiff was never formally diagnosed with "mental retardation" and had performed substantial gainful activity in the past despite her limited intelligence. Comm'r Br. at 8. Yet, the Commissioner cites no authority suggesting that Listing 12.05(C) demands a formal diagnosis of mental retardation before benefits may be awarded. S*ee Maresh v. Barnhart*, 431 F.3d 1073, 1075 (8th Cir. 2005) (rejecting that very argument). Likewise, she offers no support for the view that Plaintiff's previous determination to work in spite of her limitations categorically prohibits Plaintiff from qualifying for benefits at Listing 12.05(C). *See Brown v. Sec'y of Health & Human Servs.*, 948 F.3d 268, 270 (6th Cir. 1991) (holding that a claimant satisfied

11

Listing § 12.05(C) even though he had worked as a truck driver and had "recorded mileage, the hours he worked, and the places he drove").

In addition, Emerson's 2002 report contained a number of interesting findings that the ALJ did not include in his decision denying benefits.  For one, Emerson noted that the configuration among Plaintiff's performance, verbal, and full-scale IQ scores had been associated with patients suffering from anxiety, tension, and/or obsessive-compulsive disorder.  (R. at 187).  It is undisputed that Plaintiff suffered from anxiety and "a bipolar disorder."  (R. at 22).  Emerson also noted that aspects of Plaintiff's test results corresponded with a "poor ability to concentrate," a high level of "distractibility," an increased level of anxiety, poor planning abilities, impulsivity, procrastination, depression, and poor interpersonal relationships.  (*Id.*).  These findings perhaps explain the "statistically significant" disparity between Plaintiff's performance and verbal IQ's, but neither Emerson, nor the ALJ, nor the Commissioner have explained why the former score should be singled out as "invalid."  Section 12.00D.6c. of the listings suggests that it should not.

In short, Emerson's report did not contain substantial evidence to support the ALJ's decision not to credit the lowest among Plaintiff's verbal, performance, and full-scale IQ scores in 2002.

Finally, *Elam ex. rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124 (6th Cir. 2003), does not support the Commissioner's position.  In that case, the claimant's verbal score of 57 was the lowest among her three scores on a WISC test that was administered in 1997.  *Elam*, 348 F.3d at 126.  The scores were considered *invalid*, however, for several reasons.  First, the

claimant's verbal score on the same test just one year earlier, in 1996, had been 75. *Id.*
Second, the claimant's verbal score was inconsistent with her "significantly higher" verbal
performance on the WRAT-III. *Id.* Third, the examiner's conclusion of the invalidity of the
claimant's IQ scores was corroborated by the testimony of another mental health expert at
the claimant's hearing. *Id.* (noting that the testifying expert *observed* the claimant and
concluded that her *actual* communicative skills were inconsistent with her low verbal IQ).
Fourth, the claimant's teachers had provided assessments regarding the claimant's in-class
verbal skills that contradicted her low verbal IQ. *Id.* at 127.[12] Because substantial evidence
supported the decision to reject the scores, the ALJ was not required to use those scores to
evaluate whether the claimant met or equaled the listing in question.

*Elam* thus merely reaffirms the principle that IQ scores must be valid before they may
qualify an applicant for benefits pursuant to Listing 12.05(C). *See also Brown v. Sec'y of*
*Health & Human Servs.*, 948 F.3d 268, 269 (6th Cir. 1991). In *Elam*, substantial evidence in
the record of the claimant's actual verbal skills independently confirmed the conclusion that
the low scores were not valid. *Elam*, 348 F.3d at 126–127. Here, while both the examiner
and the ALJ placed great emphasis on Plaintiff's higher-than-expected verbal IQ,[13] neither of
them made any effort to *in*validate her performance IQ by reference to record evidence of

---

[12]In addition, the claimant was pursuing a position on her high school basketball team, she participated in
church and social functions, and she had ten girlfriends with whom she socialized. One of her ninth grade teachers
described her as a "typical ninth grade student." *Id.* at 127.

[13](R. at 187–188) (stating the difference between the verbal and performance IQ's was "statistically
significant, favoring the Verbal;" noting Plaintiff had a higher-than-expected ability to read and spell). In *Elam*,
though, *all* of the 1997 IQ scores were disregarded—not simply the ones that mandated a finding of disability.
*Elam*, 348 F.3d at 126 (reporting a performance score of 77, which would not have satisfied Listing 12.05(C)).

actual functioning as in *Elam*.  *See also, e.g., McDonald v. Sec'y of Health & Hum. Servs.*,
No. 85-3322, 1986 U.S. App. LEXIS 22988, at *14–15 (6th Cir. Feb. 25, 1986) (per curiam)
(unpublished opinion) (illustrating how a low IQ score may be refuted by evidence of
"academic success, occupational success, independent living, and ability to care for []self.").[14]

This "cherry-picking," *see Ellis v. Barnhart*, 392 F.3d 988 (8th Cir. 2005), of the record to find
the "best estimate" of a claimant's intellectual functioning seems precisely what section
12.00D.6c. of the Listing was designed to avoid.  *See* 20 C.F.R. Part 404, Subpart P,
Appendix 1, § 12.00D.6c.; *c.f. Johnson v. Sec'y of Health & Human Servs.*, 794 F.2d 1106,
1114 (6th Cir. 1986) ("[The Listing] takes away a certain amount of case-by-case flexibility.").

Accordingly, so long as the performance IQ was at least valid, the ALJ was required to accept
it even if another score was a better "estimate."  Nothing in *Elam* suggests otherwise.  *But see*
Comm'r Br. at 7 (calling Emerson's evaluation "substantial evidence," even though that
evaluation also failed to refute the validity of Plaintiff's low performance IQ).

### III.

There is no dispute in this case that Plaintiff suffered from "significantly subaverage
general intellectual functioning" that had "initially manifested before age 22."  20 C.F.R. Part
404, Subpart P, Appendix 1, Listing 12.05.  The ALJ also admitted that Plaintiff suffered from

---

[14]The Commissioner does not seriously contend that Plaintiff's performance IQ should be held invalid
simply because Plaintiff reads, listens to the radio, occasionally watches television, and has one friend and a
boyfriend whom she sees on the weekend.  (R. at 17); *accord Brown v. Sec'y of Health & Human Servs.*, 948 F.2d
268, 270 (6th Cir. 1991) (rejecting argument that full-scale score of 68 was invalid because claimant used public
transportation, held a driver's license (like Plaintiff), visited friends, was able to make change at the grocery store,
could do his own laundry and clean his room, completed the sixth grade, had a limited level of reading
comprehension, and had worked as a truck driver).

"mental impairment[s] imposing . . . additional and significant work related limitation[s] of function[.]" (R. at 22, 472); Listing 12.05(C).   The sole, narrow question before the ALJ with respect to mental retardation, then, was whether Plaintiff complied with the requirement of submitting a "*valid* verbal, performance, *or* full scale IQ of 60 through 70." Listing 12.05(C) (emphases added).   For the reasons explained above, the ALJ should have answered that question in the affirmative.

The Commissioner's final decision is REVERSED and she is directed to award benefits not inconsistent with this order.   The Clerk is directed to prepare final judgment accordingly.

IT IS SO ORDERED.

 s/ **James D. Todd**
JAMES D. TODD
UNITED STATES DISTRICT JUDGE

15